1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHARLES G. REECE,                        No.  2:10-cv-0203-JAM-EFB P

12              Plaintiff,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   D.K. SISTO, et al.,

15              Defendants.

16

17        Plaintiff is a state prisoner proceeding pro se and in forma pauperis in an action brought

18   under 42 U.S.C. § 1983.  He asserts an Eighth Amendment conditions-of confinement claim,

19   alleging that defendants exposed him to an excessively cold dorm for several winters.

20        Defendants' motion for summary judgment (ECF No. 80) and motion to strike plaintiff's

21   surreply (ECF No. 93) are pending.  In their motion for summary judgment, defendants generally

22   argue that they: (1) provided adequate heat to plaintiff's dorm; (2) lacked subjective awareness of

23   the alleged cold; and (3) enjoy qualified immunity.  In their motion to strike, they argue that

24   plaintiff lacked a legal basis to file his surreply.  As discussed below, both motions should be

25   granted in part and denied in part.

26   /////

27   /////

28   /////

                                            1

**I.      Background**

Plaintiff is a state inmate who was incarcerated at California State Prison, Solano ("SOL") from January 30, 2003 to November 22, 2011. Pl.'s Dep., ECF No. 81 at 10. Defendant Mims has worked at SOL since 1985. ECF No. 80-7 ¶ 1. Mims became acting Correctional Plant Manager II in October 2008, and Correctional Plant Manager II in April 2010. *Id.*; ECF No. 77 at 105. Defendant Sisto served as Warden at SOL from March 2006 until December 2009, whereupon he retired. ECF No. 80-6 ¶ 1; Pl.'s Dep. at 22–23.

When he arrived at SOL, plaintiff apparently was housed in Building 22 of D Facility. Pl.'s Dep. at 15. At an unspecified time, he moved to C Facility. *Id.* at 15–16. Shortly before July 2003, he moved to Building 19 of D Facility. *Id.* at 16. Then, in July 2003, plaintiff moved again, this time to Building 20 of D Facility. *Id.* The core of plaintiff's allegations in this case involve his contention that Building 20 was inadequately heated and violated his Eighth Amendment rights.

At Building 20, plaintiff initially stayed in X Dorm on the second tier. *Id.* In April 2005, he moved to W Dorm, which was also on the second tier. *Id.* at 17. In September 2007, he moved to L Dorm on the first tier. *Id.* at 18. There, he slept on the bottom bunk of the fifth bunk bed, which was at the corner of two 9-inch concrete walls. *Id.* at 19, 21–22, 55; ECF No. 80-7 ¶ 12(a). X, W, and L Dorms were located on the "L" side of Building 20, which is opposite the "A" side. Pl.'s Dep. at 17–19, 75; Pl.'s Sec. Am. Compl., ECF No. 53 at 65.

L Dorm was relatively small and held six to eight bunk beds. ECF No. 53 at 61; ECF No. 60-4 ¶ 4; Pl.'s Dep. at 57; ECF No. 82 at 32. A square pillar stood approximately in the middle of each L-side dorm. ECF No. 53 at 61; Dep. at 59; ECF No. 82 at 24. Vents were at the top of three of the pillar's four sides. ECF No. 53 at 61; Dep. at 60. A low wall between thirty and forty inches tall separated L Dorm from a large common area called the "dayroom." Pl.'s Dep. at 67; ECF No. 60-4 ¶ 4. Plaintiff estimates that this wall is eighteen feet from his bunk. ECF No. 82 at 24. The wall had two openings for access between L Dorm and the dayroom. ECF No. 53 at 61; Pl.'s Dep., Ex. 6, at 2–4. Three air handlers, or large vents, were on the ceiling of the dayroom. Pl.'s Dep. at 75–76; ECF No. 60-4 ¶¶ 7–8.

According to plaintiff, one of these air handlers is on the L side of the dayroom, another is on the A side, and the third is near the middle. Pl.'s Dep. at 54; ECF No. 53 at 65. Plaintiff estimates that the air handler on the L side of the dayroom is fifty to fifty-five feet from L Dorm. Pl.'s Dep. at 77. Two thermometers are located in the dayroom on the second tier, near the ceiling. ECF No. 60-4 ¶ 11. According to plaintiff, one of these thermometers is on the L side, right in front of X dorm. Pl.'s Dep. at 29–30.

On December 4, 2004, plaintiff wrote an informal 602 appeal on behalf of inmate Holloway. Pl.'s Dep. at 25–26; ECF No. 1 at 53. Pertinently, Holloway asserted that plant operations staff were violating his Eighth Amendment rights by heating the L side of Building 20 but not the A side. ECF No. 1 at 53. This appeal was granted, and maintenance was performed to rectify the lack of heat on the A side. *Id.*

On January 26, 2008, plaintiff filed his own informal 602 appeal. ECF No. 53 at 46. Therein, he asserted that Sisto and Mims had denied the prisoners on the L side of Building 20 heat for five consecutive winters. *Id.* He further asserted that "plant operations staff" went to Building 20 a week before he filed his informal appeal and turned the temperature on the A side up to 70 degrees but the temperature on the L side down to 60 degrees. *Id.* at 48. Additionally, he asserted that the temperature of his bunk was always 20 degrees lower than the temperature on the L side of the dayroom because it was next to two outer walls. *See id.*

R. Pippin, who worked for plant operations, investigated plaintiff's informal appeal, issuing a response on February 4, 2008. *Id.* at 46; Pl.'s Dep. at 27–32. In his response, Pippin stated that the "average building temperature was 73 degrees" on January 31, 2008. ECF No. 53 at 46. This reading, in Pippin's words, was "well above the mandated standard of 68 degrees." *Id.* Pippin also stated that "all three air handlers were serviced and working [pursuant to] system design standards." *Id.* Based on his investigation, Pippin "partially granted" the informal appeal. *Id.*

Dissatisfied with Pippin's response, plaintiff filed a formal appeal on February 8, 2008. *Id.* Plaintiff asserted that Pippin's response was "misleading and false" because he "did not take [the] temperature inside the dorms where the prisone[r]s live and sleep." *Id.* at 50. He also

asserted that "[a]ll three air handlers are located in the dayroom well away from any dorm" and, therefore, their heat never reached the dorm. *Id.*

C.D. Brown, Associate Warden, responded to plaintiff's formal appeal on March 19, 2008. *Id.* at 45. Brown stated that Building 20 is an "open style housing unit[] with living quarters open to the dayroom[,] allowing the conditioned space temperature to be balanced throughout the housing unit." *Id.* He also stated: "the air handling equipment was serviced on January 31, 2008; at this time, the equipment was operating pursuant to the manufacturer specifications." *Id.* Additionally, he stated that the "average housing unit temperature on January 31, 2008 was 73 degrees." *Id.* Based on his findings, Brown "granted" plaintiff's appeal. *Id.* Plaintiff did not appeal Brown's response.

Plaintiff sued Sisto and Mims on January 26, 2010. ECF No. 1. Plaintiff alleged that Sisto violated his Eighth Amendment rights because he "knowingly denied him . . . heat during the cold winter months." Likewise, plaintiff asserted that Mims violated his Eighth Amendment rights because he was the "plant operation manager . . . and knowingly denied [him] . . . heat during the cold winter months." *Id.* at 4. Plaintiff also asserted an equal protection claim based on the same core allegations. *Id.* at 6.

On April 4, 2012, the assigned district judge adopted the findings and recommendations issued on February 23, 2012. ECF Nos. 35, 37. In the February 23 findings and recommendations, the court found that plaintiff failed to exhaust administrative remedies. ECF No. 35 at 8. The court reasoned that, although his "grievance was partially granted at the informal level and fully granted at the first level or review, neither response stated that prison officials would provide heat to all dorms." *Id.* at 7. Therefore, "prison officials did not purport to grant the relief plaintiff sought." *Id.* Consequently, the court dismissed the action.

Plaintiff appealed. On August 2, 2013, the U.S. Court of Appeals for the Ninth Circuit reversed and remanded. ECF No. 43 at 2. The Ninth Circuit held that, because plaintiff's grievance "was fully granted at the first level of review," he had "no obligation to appeal from a grant of relief . . . in order to exhaust his administrative remedies." *Id.* (ellipsis in original) (citation omitted).

On November 17, 2014, the district judge adopted findings and recommendations issued on August 14, 2014. ECF Nos. 47, 49. In the August 14 findings and recommendations, the undersigned found that "plaintiff's claims arising from lack of heat before January 25, 2006 . . . [were] barred by the statute of limitations." *Id.* at 8. The court dismissed these claims with prejudice. *Id.* Further, the court found that plaintiff failed to state a cognizable Eighth Amendment claim. *Id.* However, the court dismissed this claim with leave to amend.

Plaintiff filed an amended complaint, which he amended again on May 15, 2015. ECF Nos. 50, 53. The crux of the second amended complaint is that Sisto and Mims violated his Eighth and Fourteenth Amendment rights by knowingly failing to provide adequate heat to his dorm. ECF No. 53 at 1–2. The court screened the second amended complaint and found that it contained potentially cognizable Eighth and Fourteenth Amendment claims against Sisto and Mims. ECF No. 56.

Defendants moved to dismiss. ECF No. 60. On April 1, 2016, the district judge adopted findings and recommendations issued on March 1, 2016. ECF Nos. 62, 64. In those findings and recommendations, the undersigned found that plaintiff's Eighth Amendment claim was cognizable but that his Fourteenth Amendment claim was not. ECF No. 62 at 10.

Defendants have moved for summary judgment, ECF No. 80, generally arguing that "there is no genuine issue of material fact that must be tried" on plaintiff's Eighth Amendment claim. ECF No. 80-1 at 7. To support their motion, defendants deposed plaintiff. *See* ECF No. 81. The deposition contains the following relevant testimony, much of which is disputed:

- Plaintiff has no work experience or education in the field of heating, ventilation, and air conditioning ("HVAC"). Pl.'s Dep. at 12.
- Inmates could request bed/dorm moves and plaintiff requested, and was granted, three to four such moves. *Id.* at 19–21.
- Plaintiff moved to L Dorm because he wanted a lower bunk. *Id.* at 21–22.
- While the other dorms had lower bunks, they were allegedly "filled up." *Id.* at 21.
- Pippin met with plaintiff to discuss his informal appeal and talked about the temperature in the dayroom, not the temperature in L Dorm. *Id.* at 27–30.

- Plaintiff has no "personal knowledge" that Sisto reviewed his appeal, but believes that he reviewed it. Prison regulations required the appeals coordinator to assign someone to investigate the appeal. The appeals coordinator is supposed to notify the official against whom the appeal has been filed so that he can respond. *Id.* at 26, 34–35.

- Mims knew about his appeal because "[o]nce a 602 [appeal] is filed, his name is on it, [and] he's supposed to be given an opportunity to respond to it." *Id.* at 47. Mims also knew about the alleged heating problem because he and other inmates would complain to guards on "second watch" that they had no heat. *Id.* at 48, 66. The guards would contact plant operations and/or fill out a work order regarding the alleged heating problem. *Id.* at 48–49. Plaintiff remembers only one of the guards' names, i.e., "Warren." *Id.* at 49. Additionally, Mims knew about the alleged heating problem because "a lot" of inmates in Building 20 filed appeals about it. *Id.* at 50. Plaintiff knows that other inmates filed these appeals because "he wrote some of them." *Id.* He did not keep any of these appeals and remembers the names of only two of the inmates who allegedly filed them: "Brad" and "Chuckie." *Id.*

- Plaintiff does not know if he filed any other appeals regarding the heat. *Id.* at 99, 100. He suggests that he filed one in the winter of 2010/2011, but that it was not responded to. *Id.* at 99. However, he admits that he has no evidence of it. *Id.* at 99, 108.

- No heat came out of the vents in L Dorm until December 8 or 9, 2009, whereupon it "stayed on for three days." *See* Dep. at 57–60; ECF No. 82 at 15. After that, the vents produced heat until February 2010, though only between 8 p.m. and 2 a.m. Dep. at 60–61; ECF No. 82 at 15–16. Plaintiff adds that "super cold air" came through the vents "[w]henever the heat went off." Dep. at 61.

- He was on lockdown in L Dorm from 9 p.m. to 5:30 a.m. every night. *Id.* at 43; ECF No. 77 at 71; ECF No. 82 at 18.

6

- Plaintiff testifies about the steps he took to record the temperature in his L-side dorms:

  - In January/February of 2006, he used another inmate's clock-thermometer to take the temperature around 10:30 to 11:00 at night when "the wall was sweating." Dep. at 41. He put the clock-thermometer on the floor next to the wall and left it there for twenty minutes. *Id.* at 45–46. The temperature on this occasion was 40 to 41 degrees. *Id.* at 44.

  - Plaintiff once looked at the thermometer in the dayroom near X Dorm and it read 60–62 degrees, and it was colder in L Dorm. *Id.* at 39.

  - When the outside temperature would dip "into the 30s and the 20s, the dorm temperature would go along with it" and sometimes get "below freezing." *Id.* at 106. It got below freezing "[m]aybe two or three nights" each winter, though perhaps "eight to ten times" in 2006.[1] *Id.* at 107. Plaintiff knew this because he watched weather reports on the news and/or frost would be on the ground the next morning. *Id.* at 106;

  - He knew it was cold in his dorm because, on two or three nights each winter, inmates would put soda cans against the concrete walls and they would freeze. *Id.* at 106–07. This happened about "eight or ten times" in 2006. *Id.* at 107.

- Plaintiff testifies that he had the following clothes and bedding at SOL:

  - In the winter of 2005/2006, he had (1) two wool blankets; (2) two sheets; and (3) the "standard blue," which consisted of (a) three shirts, (b) three pairs of blue jeans, (c) three to five pairs of socks, and (d) underwear. *Id.* at 88–89, 101–03.

/////

---

[1] Drawing all reasonable inferences in his favor, the court takes plaintiff's reference to 2006 as the winter of 2006/2007, when the temperatures were considerably lower than in the previous winter.

-       In the winter of 06/07, he had one blanket because the guards "raided" the other one. *Id.* at 92. He also had the standard blue. *Id.* at 93.[2]

-       In the winter of 08/09, he had the same bedding and clothes as in the winter of 06/07. *Id.*

-       In the winter of 09/10, he had (1) three or four blankets; (2) thermals; (3) gloves; (4) a blue jean jacket; and possibly (5) a sweat suit. *Id.* at 94–96.[3]

•       Plaintiff testified regarding various purchases he made at SOL. Between March 2003 and February 2010, he ordered and received multiple items, including a television set, straw hat, headband radio, beard trimmer, calculator, ear buds, and candy. *See id.* at 114–16, 118–25, 127–29. His sister bought him some of these items. *Id.* at 116–17. Further, various inmates bought items in his name. *See, e.g.*, *id.* at 120–22, 124, 130–31. The inmates did this sometimes to circumvent restrictions on the number of packages they could order through a prison catalog. *Id.* at 120.

•       The alleged cold in his L-side dorms made plaintiff "[s]everely cold for many years." *Id.* at 110. He does not mention any other alleged injuries in his deposition. *Id.*

Defendants argue that the allegedly cold conditions were not objectively serious for Eighth Amendment purposes. *See* ECF No. 80-1 at 6. Additionally, they argue that plaintiff's Eighth Amendment claim fails because defendants were not "subjectively aware" of the allegedly cold conditions. *Id.*

Objectively, defendants assert that no reasonable jury could believe that plaintiff "suffered temperatures ranging from the twenties to the forties for six winters in a row." *Id.* at 13. To support this assertion, they contend as follows:

---

[2] Plaintiff does not clearly discuss what bedding and clothes he had during the winter of 2007/2008. *See* Pl.'s Dep. 101–03, 113–14.

[3] Plaintiff also does not clearly discuss what bedding and clothes he had in the winter of 2010/2011 or in November of 2011 when he left SOL. *See* Pl.'s Dep. at 96.

- Plaintiff never asked to move beds once in L Dorm. *Id.*

- Plaintiff bought "non-essential items . . . instead of warm clothes." *Id.*

- Plaintiff suffered no physical injury "even though the conditions as alleged . . . would have caused hypothermia or even death." *Id.* at 6, 14.

- Plaintiff filed only one appeal regarding the conditions. *Id.* at 15.

- The L side of Building 20 could not have been excessively cold when the A side was not. *Id.* at 16. To bolster this point, defendants state that: (1) only a "low privacy wall" separated L Dorm from the dayroom; and (2) "three air-handling units [supplied] air to the dayroom and the dorms at the same time." *Id.* Thus, they opine that it was "not possible for the dayroom temperature to be more than two or three degrees different from the dorms." *Id.*

- Plaintiff allegedly failed to submit "evidence in the form of objective temperature readings from inside the building to indicate the actual temperature in his dorm." *Id.* at 18.

Subjectively, defendants argue that plaintiff has not shown that they were aware of the alleged cold in the L-side dorms. *Id.* at 21. They contend that Pippin, not defendants, reviewed plaintiff's informal appeal. *Id.* They also assert that, even had they reviewed the appeal, it would not have made them aware of the alleged cold because it lacked specificity. *Id.* Similarly, defendants suggest that the responses to plaintiff's appeals would not have made them aware of the alleged cold because the responses did not grant him the relief he sought. *See id.*

Alternatively, defendants raise the defense of qualified immunity. *Id.* at 22–23. Somewhat summarily, they argue that qualified immunity shields them because they (1) did not violate plaintiff's Eighth Amendment rights and (2) could have "reasonably believed that their actions were lawful." *Id.* at 24.

Plaintiff filed an opposition to defendants' motion for summary judgment, ECF No. 82, arguing that the L-side dorms lacked adequate heat. This argument has two components: (1) the heating system at SOL was inadequate to heat the L-side dorms; and (2) the resultant temperatures were excessively low. Regarding the heating system, plaintiff contends as follows:

- The 9-inch concrete walls provided no insulation from the cold. *Id.* at 13.
- The vents in L Dorm constantly sucked in "super cold" air. *Id.* at 14.
- Heat was provided to the L-side dorms only from December 2009 to February 2010 from 8 p.m. until 2 a.m. *Id.* at 15–16, 18, 20, 22.

Regarding the resulting temperatures, plaintiff asserts the following:

- Pippen and Brown's assertion that it was 73 degrees referred to the temperature in the dayroom, not in L Dorm. *Id.* at 16. The temperature in L Dorm was much lower during the day and even lower at night. *Id.*
- The average temperature in L Dorm was 40 to 43 degrees during the day in the winter and "much colder" at night. *Id.* at 22.
- Plaintiff's bed area was always 15 to 17 degrees colder than the dayroom because (1) L Dorm's vent did not produce heat and (2) his bunk was exposed to two outer walls. *See id.* at 23–24.
- From December 2009 to February 2010, the temperature in L Dorm reached 60 degrees at best between 11 p.m. and 2 a.m. *Id.* at 18, 20. By 3 a.m., however, L Dorm would be "gripped by super cold temperatures sometimes reaching as low as the 20s." *Id.* at 18, 24.
- The outer walls of the L-side dorms were like ice, producing a "super cold layer of air" that forced inmates to move their bunks 12 inches away from the wall. *Id.* at 23.
- On many nights the temperature in L Dorm fell below freezing depending on outside temperature. *Id.* at 24.
- When temperature outside was between 40 and 20 degrees, the temperature in the L-side dorms would dip accordingly, "sometime to freezing." *Id.* at 3.
- The temperature in the L-side dorms was always 15 to 17 degrees colder than the temperature outside because these dorms rooms had no heat. *Id.* at 25.

Plaintiff also disputes defendants' assertion that he had enough clothes to stay warm. He asserts that he had extra clothing only in 2009/2010. *Id.* at 5, 20–21. Yet he suggests that guards

10

raided his clothing in February 2010, leaving him with one blanket and the standard blue.  *See id.* at 18–19.  Further, he asserts that his clothes and bedding were not always available because he had to launder his clothes and use one of his sheets to cover his mattress.  *Id.* at 6.  Additionally, he asserts that he did not have three pairs of jeans and a jean jacket for his entire stay in the L-side dorms.  *Id.* at 1, 5.  Moreover, he asserts that defendants had a duty to provide him with clothes, *id.* at 2 (citing 15 Cal. Code Regs. tit. 15, § 3030(b)(1)(F)), but that they issued him summer clothing, *id.* at 7 (citing *id.* § 3030(b)(2)(F)).

Plaintiff makes various other assertions to support the argument that the L-side dorms were excessively cold:

- Moving to a different bed or dorm would not have solved the problem because all of the L sides of the 270-degree buildings had inadequate heat.  *Id.* at 2, 9.

- Defendants' responses to his appeals show that there was a heating problem because they, respectively, partially granted and fully granted them.  *See id.* at 4, 7.

- It is irrelevant that plaintiff bought nonessential items because it was defendants' duty to provide dorms with adequate heat.  *Id.* at 10.

Plaintiff disputes that the only injury he suffered was being severely cold for several years.  He states that he endured "numbing, aching, [and] stinging" in his "fingers, toes, hands, feet, [and] body."  *Id.* at 15.  Likewise, he states that he lost "feeling in his fingers, toes, hands, feet, [and] body."  *Id.* at 17.  Plaintiff adds that his "fingers, toes, hands, feet, [and] body were so cold [that] he couldn't do anything in his dorm."  *Id.* at 20.

Plaintiff also disputes that defendants lacked subjective knowledge of the allegedly cold conditions.  He insists that his appeals put them on notice of the same.  *Id.* at 2.  He contends that Mims was the only person in plant operations who could assign people to respond to appeals.  *Id.* at 3.  Therefore, Mims must have read his appeal and assigned Pippen to investigate it.  *Id.* at 3, 26.  Furthermore, he asserts that "Mims and his staff" must have notified Sisto of the appeal.  *Id.*

Additionally, plaintiff asserts that the appeals coordinator had a duty to notify defendants about his appeals.  *Id.* at 3–4 (citing 15 Cal. Code Regs. tit. 15, §§ 3084.2, 3084.5(b)(4)).

Moreover, he contends that Sisto admits in his declaration that the "chain of command" would have put his appeal "on his desk through . . . C.D. Brown." *Id.* at 26. Aside from that, he contends that his federal lawsuit notified defendants of the alleged cold in the L-side dorms and asserts that they still failed to address his concerns. *Id.* at 7, 26.[4]

Defendants' reply brief (ECF No. 91) is the same in substance as their opening brief for summary judgment with one exception. They argue that the PLRA bars plaintiff's claim because he suffered only a "*de minimus* [sic] physical injury." *Id.* at 7 (citing *Oliver v. Keller*, 289 F.3d 623, 628 (9th Cir. 2002)).

Without seeking the court's leave, plaintiff filed an unauthorized surreply (ECF No. 92), arguing that the PLRA does not bar his claim because it is undisputed that he exhausted administrative remedies. *Id.* at 6. While his surreply mostly repeats his opposition, it contains two new arguments: (1) that he did not request a new bunk because he had an unspecified medical need for a lower one, *id.* at 2; and (2) that people can endure cold temperatures without becoming hypothermic because he and other inmates once had to spend several hours on the yard when it was 34 degrees, *id.* at 3–4.

Defendants moved to strike the surreply (ECF No. 93) as unauthorized, which is addressed below.

## II.    Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986); *Nw. Motorcycle Ass'n v.*

---

[4] With his complaint, plaintiff submitted four affidavits from inmates who allegedly lived on the L-side of Building 20, including two in L Dorm. ECF No. 53 at 54–57; *see also* Pl.'s Dep. at 77–85. Although plaintiff opposition brief does not rely heavily on these affidavits, they are consistent with his main arguments. Furthermore, he attempted to authenticate them in his deposition. Pl.'s Dep. at 82–83. Defendants have not challenged these affidavits, making only a fleeting reference to them in their motion for summary judgment. ECF No. 80-1 at 18.

*U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995) (per curiam).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 324 (citation omitted) ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such

a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in [Rule 56(a)], is satisfied." *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. *Id.* If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations unsupported by evidence are insufficient to defeat the motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Devereaux*, 263 F.3d at 1076 (citations omitted). More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a reasonable jury "could return a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility. It believes the opposing party's evidence and draws inferences most favorably for the opposing party. *See id.* at 249, 255; *Matsushita*, 475 U.S. at 587. Inferences, however, are not drawn out of "thin air," and the

proponent must adduce evidence of a factual predicate from which to draw inferences. *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 837 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322). If reasonable minds could differ on material facts at issue, summary judgment is inappropriate. *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). In that case, the court must grant summary judgment.

**III.     Analysis**

**A.     Plaintiff's Evidentiary Objections**

Plaintiff objects to defendants' failure to provide him with a condensed copy of his deposition transcript. ECF No. 86. But the court already denied his motion for sanctions raising this issue. ECF No. 84 at 1–2. Defendants had no obligation to provide plaintiff a condensed copy. Furthermore, defendants filed a full copy of the transcript, which the court has reviewed. ECF No. 81. Thus, even assuming an obligation to provide plaintiff with a condensed copy of the transcript, he suffered no prejudice.

Plaintiff also objects to three affidavits submitted by defendants. ECF Nos. 39, 43, 45. J Beath submitted one. ECF No. 60-4. Beath is a Stationary Engineer for the California Department of Corrections and Rehabilitation ("CDCR"). *Id.* ¶ 1. Beath declares that he has "served the heating and system (HV) in Building 20 . . . at . . . [SOL] many times . . . through routine inspection, periodic maintenance and repair." *Id.* ¶ 2. Defendants rely on Beath's declaration for various propositions, including: (1) Building 20's "central HV system is controlled by thermostats" and the "heating set-point for the thermostat in [Building] 20 is 72 degrees"; (2) "the vents in the dorms have always been connected to the [Building] 20 central HV system, and have been properly functioning at least since [he] began [to] work at SOL in 2005; (3) "[b]ecause the same temperature air is being supplied to the dorms and dayroom, and because the dorms are open to the dayroom, it is not possible [for] the dayroom temperature to be more

15

than two or three degrees different from the dorms," and therefore, "it is impossible for the dayroom to be warm and the dorms to be freezing cold at the same time"; and (4) when he or his staff "measure ambient temperatures in the dayroom or dorms, [they] use hand-held, infrared thermometers," not the thermometers located in the dayroom near the ceiling. *Id.* ¶¶ 5, 9–11.

The stated basis for plaintiff's objection to Beath's affidavit is that plaintiff previously objected to it in 2015 and the defendants failed to respond to that objection. But the original basis for the 2015 objection is unclear. Plaintiff appears to contend that defendants never provided him a copy of the affidavit. ECF No. 61 at 1, 6, 31. He also suggests that defendants used pictures of Building 20 without properly authenticating them in the affidavit. *See* ECF No. 82 at 40. However, the record reflects that defendants served plaintiff with a copy of Beath's affidavit in 2005. ECF No. 60-5. Indeed, plaintiff seems to concede that he has a copy of it. ECF No. 82 at 40. Furthermore, the record reflects that plaintiff has viewed the relevant pictures of Building 20 and he has not asserted that they fail to fairly and accurately depict what they are offered to illustrate. ECF No. 84 at 3; *see also* Pl.'s Dep. at 75–77. Accordingly, plaintiff's objection to Beath's affidavit is overruled.

Plaintiff also objects to the affidavits of S. Cervantes and D. Foston, both of whom are CDCR employees. ECF No. 82 at 43, 45. Defendants rely on these declarations to establish that plaintiff: (1) submitted only one appeal complaining about the alleged cold in the L-side dorms; and (2) never filed an appeal alleging that guards raided his blankets and clothing. ECF No. 80-2 at 3. Plaintiff appears to argue that their affidavits are irrelevant. *See* ECF No. 82 at 43, 45. However, these propositions are clearly relevant, and it is undisputed that plaintiff never filed an appeal over guards taking blankets and clothing. Pl.'s Dep. at 92.

Furthermore, the record is clear that plaintiff filed one appeal challenging the alleged lack of heat in L-side dorms. It is undisputed that he filed an appeal in January 2008. He vaguely suggests in his deposition that he filed another in the winter of 2010/2011, but that no one responded to it. Pl.'s Dep. at 99. Yet he seems to admit that he does not know if he filed this appeal. *Id.* at 99–100. Furthermore, he seems to admit that he has no evidence of it. *Id.* at 99, 108. Defendants' evidence, including the declarations of Cervantes and Foston, indicate that he

filed no such appeal.  ECF No. 22-3 ¶¶ 4–6; ECF No. 22-2 ¶ 3.  Granted, plaintiff states that he complained to guards about the heating problem and that they contacted plant operations and/or filled out work orders.  Pl.'s Dep. at 48–49, 66.  However, this is a distinct factual contention.  Thus, the fact that plaintiff filed only one appeal complaining about inadequate heat in the L-side dorms is not reasonably in dispute.  Accordingly, his objection to the affidavits of Cervantes and Foston is overruled.[5]

### B.  Motion to Strike Plaintiff's Surreply

"Parties do not have the right to file surreplies and motions are deemed submitted when the time to reply has expired."  *Henry v. Cate*, No. 1:14–cv–00791–LJO–SKO (PC), 2015 WL 4249878, at *1 n.3 (E.D. Cal. July 13, 2015) (citing E.D. Cal. L.R. 230(l)), *report and recommendation adopted*, 1:14–cv–00791–LJO–SKO (PC) (E.D. Cal. Aug. 10, 2015).  Surreplies are generally disfavored.  *Id.* (citation omitted).  "[C]ourts have the discretion to either permit or preclude a surreply."  *Id.* (citing cases).  When a party wishes to file a surreply, the proper procedure is to seek leave to file one.  *See Garcia v. Biter*, 195 F. Supp. 3d 1131, 1132 (E.D. Cal. 2016).

"In this Circuit, courts are required to afford pro se litigants additional leniency."  *Id.* at 1134 (citing cases).  "This leniency, however, does not extend to permitting surreplies as a matter of course and the Court is not generally inclined to permit surreplies absent an articulation of good cause why such leave should be granted."  *Id.*  However, defendants raised a new argument regarding the PLRA in their reply, ECF No. 91 at 1, and good cause may include the need to address new arguments raised in a reply brief,  *Hill v. England*, No. CVF05869RECTAG, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005) (citation omitted).  The new argument raised in defendants' reply warrants granting plaintiff an opportunity to address it.

/////

---

[5] It is undisputed that, in December 2004, plaintiff filed an informal 602 appeal for inmate Holloway.  Pl.'s Dep. at 25–26; ECF No. 1 at 53.  However, this appeal alleged that there was inadequate heat on the A side of Building 20, not the L side.  ECF No. 1 at 53.  Furthermore, plaintiff cannot rely on incidents before January 25, 2006 to establish his Eighth Amendment claim because they are time-barred.  ECF No. 47 at 8.

17

However, plaintiff's surreply contains two new arguments: (1) he did not request a new bunk because he had an unspecified medical need for a lower one, ECF No. 92 at 2; and (2) people can endure cold temperatures without becoming hypothermic because he and other inmates once spent several hours on the yard when it was 34 degrees, *id.* at 3–4. These new arguments will not be considered. *Smith v. United States*, No. 2:13–CV–039–JAD–GWF, 2014 WL 1301357, at *5 (D. Nev. Mar. 28, 2014) ("Filing of surreplies is highly disfavored, as it typically constitutes a party's improper attempt to have the last word on an issue."). Accordingly, defendants' motion to strike is granted in part and denied in part.

### C.    Motion for Summary Judgment

The Eighth Amendment protects prisoners from inhumane methods of punishment and inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Where the plaintiff challenges his conditions of confinement, he must make two showings. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "First, the plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth Amendment violation." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "Second, the plaintiff must make a 'subjective' showing that the prison official acted 'with a sufficiently culpable state of mind.'" *Id.* (quoting *Wilson*, 501 U.S. at 298).

Objectively, extreme deprivations are required to make out a conditions-of-confinement claim; "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson*, 217 F.3d at 731 (citations omitted). "The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred." *Id.*

Subjectively, "an Eighth Amendment violation requires a showing that the subjective state of mind of the prison officials was culpable." *Id.* at 733 (citing *Wilson*, 501 U.S. at 298–99). For the subjective state of mind of the official to be culpable, the official must have acted with

"deliberate indifference." *Id.* (citing *Wilson*, 501 U.S. at 303). "The deliberate indifference standard requires the plaintiff to prove that 'the official knows of and disregards an excessive risk to inmate health or safety . . . .'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### 1.    **Objective Prong**

"The Eighth Amendment guarantees adequate heating." *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) (citation omitted); *see also Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) (citation omitted) ("[P]rison officials may violate an inmate's Eighth Amendment rights when they deprive him of a single identifiable human need such as . . . warmth . . . ."). "One measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses 'a substantial risk of serious harm.'" *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834). Exposure to freezing or near-freezing temperatures may subject an inmate to a substantial risk of serious harm. *See Johnson*, 217 F.3d at 730, 732–33 (reversing grant of summary judgment where inmates spent as many as seventeen hours outside in subfreezing temperatures with the clothes on their backs and disputed access to blankets and coats); *Gillespie v. Civiletti*, 629 F.2d 637, 639, 642 (9th Cir. 1980) (reversing district court's dismissal of conditions-of-confinement claim where plaintiff alleged that prison officials placed him in an isolation cell with "near freezing" nighttime temperatures for an unspecified amount of time less than 2.5 months).

Courts may consider a variety of factors to determine whether allegedly cold prison temperatures pose a substantial risk of serious harm.[6] One key factor is the duration of the exposure. *See, e.g., Johnson*, 217 F.3d at 731. Another important consideration is the severity of the temperatures. *See, e.g., id.* at 732–33. A third factor is whether other deprivations

---

[6] *Johnson*, 217 F.3d at 731; *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997); *Ray v. Schoo*, No. CV 10–942–VAP (PJW), 2014 WL 59733, at *2 (C.D. Cal. Jan. 2, 2014) (citations omitted).

19

accompany the lack of heat.[7]  Fourth, courts may also consider the extent to which the allegedly

cold temperatures harm the plaintiff.  *See Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

*But see Farmer*, 511 U.S. at 845 (citation and bracketing omitted) (stating that "deliberate

indifference does not require a prisoner seeking a remedy for unsafe conditions to await a tragic

event . . . before obtaining relief"); *Dixon*, 114 F.3d at 644 (citation omitted) ("Cold temperatures

need not imminently threaten inmates' health to violate the Eighth Amendment.").  The absence

of substantial harm, however, is not dispositive.  *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992);

*Jett*, 439 F.3d at 1096.

Here, percipient witnesses have provided conflicting accounts as to temperature

conditions in Building 20.  If a jury were to credit plaintiff's testimony it could conclude that the

temperatures in the L-side dorms posed a substantial risk of serious harm.  Plaintiff, as a

percipient witness, states that the average temperature in the L-side dorms during the day in the

cold winter months was between 40 and 43 degrees, and that it was "much colder" at night.  ECF

No. 82 at 22.[8]  He also states that, outside of December 2009 to February 2010, the vents in L

Dorm constantly produced "super cold" air.  ECF No. 82 at 14; *see also* Dep. at 61–62.  In

disputing plaintiff's version, defendants contend that plaintiff has submitted no "evidence in the

form of objective temperature readings from inside the building to indicate the actual temperature

in his dorm."  ECF No. 80-1 at 18.  However, plaintiff states that he once recorded a temperature

---

[7] *See, e.g., Wilson*, 501 U.S. at 304 (stating that "a low cell temperature at night combined with a failure to issue blankets" may violate the Eighth Amendment even if these conditions "would not do so alone"); *Conner v. Griego*, 453 F. App'x 733, 735 (9th Cir. 2011) (unpublished memorandum) (reversing grant of summary judgment on conditions-of-confinement claim where inmate's evidence showed that "for over one month, he was subjected to freezing temperatures and not provided bedding, a change of clothes, showers, or hygiene products"); *Johnson v. Swinney*, No. 92-15601, 1993 WL 230192, at *3 (9th Cir. June 28, 1993) (unpublished memorandum) (citation omitted) (reversing grant of summary judgment where plaintiff asserted that prison officials subjected him to a "low cell temperature" for five days and failed "to issue blankets").

[8] Unless otherwise noted, to rule on defendants' motion for summary judgment, the court relies on assertions that plaintiff makes in his sworn opposition.  *Winterrowd v. Nelson*, 480 F.3d 1181, 1183 n.3 (9th Cir. 2007) (holding that courts have discretion to treat factual assertions that a pro se plaintiff makes in a legal memorandum as evidence for summary judgment purposes when he signs it under the penalty of perjury).

of 40 to 41 degrees in the space between the concrete wall and his bunk, and defendants admit

that they did not record the temperature in this area for some of the winters in question. ECF No.

77 at 66. Additionally, plaintiff states that the thermometer in the dayroom once read 60–62

degrees and that it was colder in L Dorm. While defendants want the court to discount the

credibility of plaintiff's testimony, that cannot be done on summary judgment.

Plaintiff further states that the temperature in the L-side dorms went below freezing on

two to three nights each winter, and eight to ten nights in 2006/2007. He adds that he knew it was

excessively cold on these nights because pop cans would freeze if he put them against the

concrete walls next to his bed.

This evidence, if believed, is sufficient to permit a reasonable jury to conclude that the

temperatures near his bunk were frequently "near freezing." *See Gillespie*, 629 F.2d at 642.

Furthermore, plaintiff contends that these conditions were "lengthy" because they allegedly

persisted for five full winters and parts of two others. *See Johnson*, 217 F.3d at 732 (citation

omitted); *see also Dixon*, 114 F.3d at 643 ("[I]t is not just the severity of the cold, but the duration

of the condition, which determines whether the conditions of confinement are unconstitutional.").

Therefore, even if the temperatures were "[m]ore modest [than freezing]," a reasonable juror

could still conclude that they posed a substantial risk of serious harm. *See Johnson*, 217 F.3d at

732 (citation omitted).[9]

Defendants counter that it was impossible for the L side of Building 20 to be excessively

cold when the A side was not. To support this argument, they assert that: (1) only the low privacy

wall separated L Dorm from the dayroom; and (2) the three air handlers heated the dayroom and

the dorms at the same time. Further, they argue that: (1) Mims' affidavit and the responses to

plaintiff's appeal show that the heating system in Building 20 was operational; (2) the heating set-

point is 72 degrees; and (3) the average temperature was around 73 degrees.

But plaintiff contends that the heat produced by the air handlers did not reach the L-side

dorms, particularly his bed area. He further asserts that the vents in the L-side dorms were

---

[9] Other inmates' affidavits describe similar conditions. *See, e.g.*, ECF No. 53 at 57
(declaring that the temperature in L Dorm was "never out of the 50s").

emitting excessively cold air.  Although defendants stress that plaintiff has no knowledge of HVAC systems, one does not have to be an HVAC technician to know whether a heater in his residence is producing heat to warm the space.  *Lopez v. Adams*, 1:07-cv-00808-LJO-DLB, 2011 WL 219932, at *5 (E.D. Cal. Jan. 21, 2011) ("[F]eelings of cold can be experienced through one's senses."), *report and recommendation adopted*, 1:07-cv-00808-LJO-DLB (E.D. Cal. Mar. 17, 2011).  Furthermore, plaintiff disputes that Pippen took the temperature in L Dorm, and his response to the informal appeal says that he took "the average *building* temperature."  ECF No. 53 at 46.  Thus, whether the L side of Building 20 was substantially colder than its A side is a genuine dispute of material fact.

Defendants also infer that L Dorm was not as cold as plaintiff contends because he: (1) never asked to move beds once there even though he had moved beds before; (2) bought nonessential items; and (3) filed only one appeal.  While defendants are free to argue at trial that these may be reasons to discount the credibility of plaintiff's testimony, there clearly are genuine issues of disputed fact over the temperatures in Building 20.  Furthermore, plaintiff's informal and formal appeals were, respectively, partially and fully granted, which arguably supports the position that L Dorm had a heating problem.  While the substance of the responses suggests otherwise, *see* ECF No. 53 at 45–46, the trier of facts must decide whether they evidence a heating problem.  Furthermore, while plaintiff did not ask to move beds once in L Dorm, he states that he wanted a lower bunk and that the other ones were filled up.  He also argues that switching beds would have been futile because the entire L side of Building 20 was cold, an assertion that he supported with other inmates' affidavits.  Additionally, while he bought several nonessential items, he states that not all of them were for him.  Moreover, while an ordinary person who was "severely cold" might have bought warm clothes instead, the court will not guess at plaintiff's motivation.  *Cf. Castaneda v. Partida*, 430 U.S. 482, 499 (1977) (stating that there are "many facets of human motivation").

Defendants also argue that the temperatures in the L-side dorms were not excessively cold because plaintiff suffered no physical injury.  ECF No. 80-1 at 14–15.  The argument is a non sequitur.  To support the argument, defendants note that plaintiff stated in his deposition that his

only injury from the allegedly cold conditions was that he was "[s]everely cold for many years." Pl.'s Dep. at 110. However, in his sworn opposition, he states that he endured "numbing, aching, [and] stinging" in his "fingers, toes, hands, feet, [and] body." ECF No. 82 at 15. Further, he states that he lost "feeling in his fingers, toes, hands, feet, [and] body." *Id.* at 17. He adds that his "fingers, toes, hands, feet, [and] body were so cold [that] he couldn't do anything in his dorm." *Id.* at 20. Construing the evidence in his favor, a reasonable juror could find that his assertions about pain, loss of feeling, and diminished mobility are clarifications of the effects that being severely cold for several winters had on him, regardless of whether it resulted in a lasting physical injury.

Defendants attack the credibility of plaintiff's assertion that he suffered any harm from being cold. According to their medical expert, Dr. Barnett, plaintiff's medical records show that he had complained of numbness and loss of feeling in various body parts as early as January 2001. ECF No. 80-5 ¶ 9. But Dr. Barnett declares that plaintiff did not expressly attribute this problem to cold exposure. *Id.* Thus, Dr. Barnett concludes that the alleged cold exposure did not cause these injuries. *Id.* The gist of this argument is, again, to attack the believability of plaintiff's testimony. However, as to disputes over material facts "[c]redibility determinations . . . are jury functions." *Anderson*, 477 U.S. at 255. Plaintiff's alleged injures are more extensive than those that Dr. Barnett discusses, and a jury will be free to assess plaintiff's credibility in light of Dr. Barnett's testimony. Likewise, a jury is generally free to believe or disbelieve expert testimony. *See United States v. Rutgard*, 116 F.3d 1270, 1281 (9th Cir. 1997).

Dr. Barnett also opines that plaintiff could not have possibly endured excessively cold conditions for several winters. *See generally* ECF No. 80-5. In this regard, he states that plaintiff "would have necessarily exhibited hypothermia or other sequellae" if he "endured the [allegedly cold] conditions." *Id.* ¶ 5. However, plaintiff states that he had some clothes during the winters in question, including at least one blanket. Furthermore, while he states that he was on lockdown from 9 p.m. to 5:30 a.m., he was evidently allowed in the dayroom during the day. There, plaintiff states the temperature was around 60 degrees. *See* Pl.'s Dep. at 36; ECF No. 82 at 23. Granted, these less harsh conditions may not change Dr. Barnett's opinion as they mirror those on

which he bases his opinion.  *See* ECF No. 80-5 ¶¶ 5–6.  Yet the "jury decides how much weight to give [his] testimony," *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), and may "reject his opinion entirely if [they] think that the reasons given in support of [it] are unsound," *Holm v. United States*, 325 F.2d 44, 46 (9th Cir. 1963).  *See also Del Raine v. Williford*, 32 F.3d 1024, 1035 (7th Cir. 1994) ("To only find an Eighth Amendment violation from inadequate housing when the inmate's health is endangered [erroneously] suggests that frostbite, hypothermia, or a similar infliction is an absolute requisite to the inmate's challenge.").  In short, in determining Barnett's credibility, the jury will be free to assess the assumptions he made in forming his opinions in relation to the facts as the jury finds them to have existed in light of all of the testimony and evidence.

Additionally, defendants argue that the fact that plaintiff had clothes and at least one blanket shows that he did not face a substantial risk of serious harm.  However, it is unclear from the record exactly how many clothes he had at any given time and when he had them.  Furthermore, he states that guards "raided" his clothes.  While defendants note that he did not appeal the alleged raids, it is not a question of exhaustion but rather whether plaintiff did or did not have the blankets and/or clothing that defendants suggest.  Whether the failure to raise the alleged raids in an appeal undermines plaintiff's credibility is a determination for the jury that cannot be made on summary judgment.  The jury must determine the extent to which plaintiff had "alternative means of warmth" and decide whether they were "adequate to combat the [alleged] cold."  *Dixon*, 114 F.3d at 643 (citation omitted).

Defendants also argue that no reasonable juror could believe plaintiff's assertion that it was "always" 15 to 17 degrees colder in the L-side dorms than the temperature outside.  *See* ECF No. 80-1 at 17–18.  Government weather data for the winters in question show the average monthly minimum outside temperature at the airport nearest SOL was about 41.2 degrees.[10]  If it

_____

[10]  *See* Fed. R. Evid. 201(b)(2) (courts may judicially notice facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be question"); *Pate v. Norris*, No. 4:05CV00491 GH-JFF, 2007 WL 990698, at *19 n.10 (E.D. Ark. Mar. 29, 2007) (citing cases) ("A court can take judicial notice of weather data . . . contained in government weather bureau records."); *United States v. Foreman*, 369 F.3d 776, 786 (4th Cir. 2004) ("[T]he court can take judicial notice of the temperature . . . ."); *Del Raine v. Williford*, 32 F.3d 1024,

was "always" 15 to 17 degrees colder in the L-side dorms, the average monthly minimum temperatures in the L-side dorms would have been around 24.2 to 26.2 degrees. Yet plaintiff testified that it fell below freezing in the L-side dorms on only two or three nights each winter, though perhaps eight to ten nights in 2006. Pl.'s Dep. at 107. Furthermore, plaintiff never testified that the temperatures fell below the 20s. *See id.* at 106. Consequently, a reasonable jury could not believe an assertion it was "always" 15 to 17 degrees colder in the L-side. But plaintiff's loose usage of the word "always" does not alter the main thrust of his core allegations, i.e. that temperatures on the side of the building where he was housed were consistently lower during the winter months and that at times they were low enough and sustained enough to implicate his Eighth Amendment rights.[11]

Thus, despite the unreasonableness of his use of the word "always," a reasonable jury could nonetheless conclude on this record that the temperatures in the L-side dorms were excessively low. As discussed, plaintiff states that the average temperature there during the day in the cold winter months was between 40 and 43 degrees, and that it was "much colder" at night. ECF No. 82 at 22. He further states that he once recorded a temperature of 40 to 41 degrees in the space between the concrete wall and his bunk. ECF No. 77 at 66. Additionally, he states that the thermometer in the dayroom once read 60–62 degrees and that it was colder in L Dorm.

---

1036 n.4 (7th Cir. 1994) (approving district court's judicial noticing of temperatures at nearest airport to help determine temperatures in allegedly cold prison); *McAffee v. United States*, 111 F.2d 199, 203 n.9 (D.C. Cir. 1940) (taking judicial notice of temperature data from the U.S. Department of Agriculture); Alan Wright & Kenneth W. Graham, Jr., 21B *Federal Practice and Procedure* § 5106 (2d ed. 2009) ("Some writers have exemplified ascertainable facts by . . . the weather on a particular day from the records of the Weather Bureau."); *cf. Village of Evanston v. Gunn*, 99 U.S. 660, 666 (1878) (approving district court's use of weather data from U.S. Signal Service).

[11] *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (citing cases) ("[A] party cannot create a genuine issue of fact . . . by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity."); *Oliver*, 289 F.3d at 629 (citation omitted) ("Appellant cannot generate an issue of material fact by providing contradictory statements."); *cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Moreover, he states that the temperature in the L-side dorms went below freezing on two to three nights each winter, and eight to ten nights in 2006/2007. He adds that he knew it was excessively cold on these nights because soda cans would freeze if he put them against the concrete walls next to his bed.

Defendants argue that the assertion that the average daytime temperature in the L-side dorms was 40 to 43 degrees is implausible. The lowest average daily temperature from the temperature data set forth in the appendix is 45.5 degrees in January 2007. *See infra*, App., at 34. Furthermore, the average daily temperature for December, January, and February (the coldest months) is 48.6 degrees. *See infra*, App., at 34–35. Mims declaration adds that: (1) "it is not possible for the L-side Dorm temperature to be below 50 degrees"; (2) "[b]asic laws of thermodynamics dictate that the inside . . . air temperature cannot be less than the outside . . . temperature without a mechanical air cooling system such as refrigeration or air conditioning"; and (3) Building 20 does not have a mechanical air cooling system." ECF No. 80-7 ¶ 12. But plaintiff asserts that, outside of December 2009 to February 2010, the vents in L Dorm constantly emitted "super cold" air. ECF No. 82 at 14; *see also* Pl.'s Dep. at 61–62. While it is undisputed that plaintiff has: (1) no work experience or education in the HVAC field; and (2) no knowledge of how the heating system in Building 20 operates, Dep. at 12, 66, cold air coming through a vent "can be experienced through one's senses." *Lopez*, 2011 WL 219932, at *5. Furthermore, another inmate also asserts that cold air entered through the vents, stating in his affidavit that the vents "suck[ed] in cold outside air." ECF No. 53 at 56. Thus, whether "super cold" air was coming through the vents, and whether such air made the inside temperature lower than the outside temperature, are disputed questions of material fact. *See Dixon*, 114 F.3d at 643 ("[T]he question of . . . the severity of the cold[] . . . will often be peculiarly appropriate for resolution by the trier of facts.").

Defendants also assert that plaintiff suffered no more than *de minimis* injury. ECF No. 91 at 7 (citing *Oliver*, 289 F.3d at 628). They argue that this bars plaintiff's claims under the PLRA. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . .").

However, "§ 1997e(e) applies only to claims for mental and emotional injury." *Oliver*, 289 F.3d at 629. Here, by contrast, plaintiff alleges "physical injury and discomfort," *Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014), such as "severe pain," ECF No. 53 at 4, and numbness, loss of feeling, and diminished mobility, ECF No. 82 at 15, 17, 20. Furthermore, plaintiff requests several remedies, including compensatory damages, punitive damages, declaratory relief, injunctive relief, and "other and further relief," which includes nominal damages. ECF No. 53 at 4–5. Section 1997e(e) does not bar such relief. *Grenning*, 739 F.3d at 1238 (holding that § 1997e(e) did not apply to plaintiff alleging "various forms of physical injury and discomfort," and who sought "a declaratory judgment . . . , an injunction . . . , compensatory damages, and other relief"); *Oliver*, 289 F.3d at 630 ("To the extent that appellant has actionable claims for compensatory, nominal or punitive damages—premised on violations of his [Eighth] Amendment rights, and not on any alleged mental or emotional injuries—. . . the claims are not barred by § 1997e(e).").

Defendants' case citations are unhelpful. In the Ninth Circuit, they rely primarily on three district court cases.[12] These cases are inapposite. In *Jacobs*, the plaintiff only generally alleged that it was "freezing" and "cold" in his cell. 2015 WL 4755956, at *6. Also, he failed to "specifically quantify in degrees the temperature in [his] cell of which he complained, [or] . . . explain upon what he was basing his terms of 'freezing' and 'cold' aside from his impression of the temperature he perceived via his skin." *Id.* Here, however, plaintiff provides reasonably specific estimates of the temperature in the L-side dorms. Furthermore, even though people can sense cold, plaintiff states that he took the temperature in his dorm and the dayroom with thermometers. *Garland* is likewise distinguishable. There, while the plaintiff claimed that the "temperatures inside the facility were 'very cold' and 'freezing,' he provide[d] no objective indication, or even estimate, of the actual temperature in or outside of the institution." 2015 WL

---

[12] *See generally Jacobs v. Quinones*, No. 1:10–cv–02349 AWI JLT (PC), 2015 WL 4755956 (E.D. Cal. Aug. 11, 2015), *report and recommendation adopted*, No. 1:10–cv–02349 AWI JLT (PC) (E.D. Cal. Apr. 27, 2016); *Garland v. Stanley*, No. 1:12–cv–01755–AWI–MJS (PC), 2015 WL 1513635 (E.D. Cal. Mar. 30, 2015); *Viera v. Lewis*, No. C 12–1497 RS (PR), 2014 WL 3853142 (N.D. Cal. Aug. 4, 2014).

1513635, at *7. In this case, beyond providing such indications and estimates, plaintiff allegedly

knew it was cold outside because he watched the news and weather reports and saw frost on the

ground. And the court took notice of the average minimum temperatures near SOL during the

winters in question, several of which are in the 30s. *Viera* is inapplicable because the plaintiff

raised only a "generalized contention that his cell [was] 'oppressively hot or cold.'" 2014 WL

3853142, at *4.

In sum, taking as true plaintiff's evidence and drawing inferences in his favor, a

reasonable jury could conclude that the alleged lack of heat in the L-side dorms posed a

substantial risk of serious harm. Accordingly, he has satisfied the objective prong of his

conditions-of-confinement claim for purposes of overcoming summary judgment.

## 2.     **Subjective Prong**

To establish his conditions-of-confinement claim, plaintiff must show that defendants

knew of and disregarded an excessive risk to his health or safety. *Farmer*, 511 U.S. at 837.

"[T]he official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Whether an

official possessed such knowledge 'is a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence . . . .'" *Johnson*, 217 F.3d at 734 (quoting

*Farmer*, 511 U.S. at 842).

### a.     **Defendant Mims**

Here, a reasonable juror could conclude that Mims knew of the allegedly cold conditions

in the L-side dorms and disregarded them. It is undisputed that plaintiff filed an appeal regarding

the alleged cold in January 2008. Furthermore, plaintiff and another inmate state that they

complained to guards about heating problems and that the guards contacted plant operations

and/or filled out work orders. Pl.'s Dep. at 48–49, 66; ECF No. 53 at 57. Furthermore, plaintiff

states that a lot of inmates in Building 20 filed appeals regarding the alleged lack of heat, Dep. at

50, and Mims acknowledges that "it is not unusual for inmates to complain that the temperature in

the housing units at [SOL] is too . . . cold," ECF No. 80-7 ¶ 11. Therefore, believing plaintiff's

evidence and construing it favorably, a reasonable jury could find that plaintiff and other inmates

frequently complained to plant operations about the alleged heating problem in the L-side dorms and that the living conditions were unreasonably cold, even to the point of presenting health risks to inmates.

Likewise, a reasonable jury could find that Mims knew of these complaints and disregarded them. Mims has worked for the CDCR since 1985 and served as the plant manager since October 2008. ECF No. 80-7 ¶ 1. As plant manager, Mims is "responsible for directing the maintenance and plant operations activities" at SOL, which includes "the function, maintenance and repair of Building 20's heating and ventilation system." *Id.* ¶ 2. Additionally, Mims states that he takes inmate complaints about heating problems seriously (*id.* ¶ 11), a fact from which a jury could reasonably infer that Mims learns about the complaints. Further, Mims acknowledges receiving plaintiff's appeal upon service of this lawsuit. ECF No. 80-7 ¶ 4. While the record does not fully reflect when he was served, it was apparently between September 14, 2010 and June 13, 2011. *See* ECF Nos. 14, 23. Both of these dates come before plaintiff left SOL on November 22, 2011. Nevertheless, there is no indication that Mims investigated plaintiff's complaints after service with the lawsuit. Moreover, the allegedly cold conditions that plaintiff describes are serious and persisted for five full winters and parts of two others. Thus, given his responsibility over the function and maintenance of Building 20's heating system, a reasonable juror could infer that that Mims must have known about the conditions. Accordingly, believing plaintiff's evidence and construing it favorably, a reasonable juror could conclude that Mims was deliberately indifferent to the allegedly cold conditions in Building 20's L-side dorms.

Mims asserts that he was not aware of the allegedly cold conditions in the L-side dorms because Pippen, not Mims, reviewed plaintiff's appeal. ECF No. 80-1 at 21. Mims also argues that, even had he read the appeal, it would not have apprised him of the alleged cold because it does not mention freezing temperatures. *Id.* But the issue is whether there were persistent complaints of unreasonably cold temperatures and cold drafts during the winter, not whether those complaints stated that the temperatures reached the level of freezing. Plaintiff alleges that he and other inmates repeatedly complained about the problem and Mims acknowledges that inmates regularly made such complaints; indeed, he says he took the complaints seriously.

1    Therefore, even if Mims did not review plaintiff's specific appeal or its response, a reasonable

2    juror could conclude that he was aware of conditions at issue in the case.

3            Moreover, as noted, Mims acknowledges that he learned about plaintiff's appeal and its

4    response when he was served with this lawsuit.  There is no indication that he investigated

5    plaintiff's concerns even though the conditions described in his complaint are longstanding and

6    severe.  Mims counters that the response to the appeal failed to notify him of a heating problem

7    because it said that the heating system functioned and the temperature in Building 20 was 73

8    degrees.  *Id.*  However, as noted, plaintiff asserts that Pippen took the temperature in the

9    dayroom, not the L-side dorms.  Furthermore, plaintiff's informal and formal appeals were,

10   respectively, partially and fully granted, which arguably supports the position that the L-side

11   dorms had a heating problem.

12           Thus, viewing the evidence in plaintiff's favor, a reasonable jury could find that Mims

13   knew of and disregarded the allegedly cold conditions in Building 20's L-side dorms.

14                       **b.      Defendant Sisto**

15           By contrast, the evidence presented as to Sisto would not permit a jury to reasonably

16   conclude on this record that Sisto knew of and disregarded the alleged lack of heat in Building

17   20's L-side dorms.  Sisto states that, as warden, he had no direct supervision over plant

18   operations, ECF No. 80-6 ¶ 2, and plaintiff has not shown otherwise.  Sisto states that his staff has

19   never reported to him that the temperature in Building 20 fell "into the twenties, thirties, [and]

20   forties, and [he was] not aware that his condition ever occurred."  *Id.* ¶ 6.  Additionally, Sisto

21   states that he does not recall seeing plaintiff's appeal or its responses before service with this

22   lawsuit.  *Id.* ¶ 4.  Although the lawsuit apprised him of the conditions, it is undisputed that Sisto

23   had already retired when he was served.  *Id.* ¶ 1; Dep. at 22–23.  Therefore, despite his ostensible

24   awareness of the conditions at the time of service, Sisto could not have been "responsible for"

25   addressing them.  *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992), *overruled on*

26   *other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

27           Plaintiff argues that Brown, associate warden, responded to his formal appeal and that

28   Sisto admits in his declaration that that Brown would have reported the matter to him through the

chain of command.  However, Sisto makes no such admission.  Rather, he states that plant

operations staff report to "the Chief of Plant Operations, who reports to [the] Associate Warden

of Business Services[,] who in turn reports to [the] Chief Deputy Warden," who in turn reports to

him.  ECF No. 80-6 ¶ 2.  Assuming the Chief of Plant Operations, whom plaintiff fails to identify,

knew about the conditions in the L-side dorms, it is speculative to assume that they were reported

all the way up the chain of command to Sisto.  *See Cafasso*, 637 F.3d at 1061 ("To survive

summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not

sweeping conclusory allegations.").  Further, plaintiff contends that Sisto must have known about

his appeal because he named him in it and the appeals coordinator had a duty to notify him about

it.  ECF No. 82 at 3–4 (citing 15 Cal. Code Regs. tit. 15, §§ 3084.2, 3084.5(b)(4)).  However,

these regulations impose no such duty on the appeals coordinator.  *See id.*  Nor does any other

provision of section 3084, at least as applied to this case.  *See generally id.* §§ 3084–3084.9.

Accordingly, no reasonable juror could conclude that Sisto was deliberately indifferent to the

alleged cold.

### D.     Qualified Immunity

Qualified immunity protects government officials from liability for civil damages where a

reasonable official would not have known that his conduct violated a clearly established right.

*Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987).  In resolving questions of qualified

immunity, "courts engage in a two-pronged inquiry."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1865

(2014) (per curiam).  "The first asks whether the facts, taken in the light most favorable to the

party asserting the injury, . . . show the officer's conduct violated a federal right."  *Id.* (citation

and bracketing omitted).  "The second prong . . . asks whether the right in question was clearly

established at the time of the violation."  *Id.* at 1866 (citation omitted).

A right is "clearly established" when "the contours of the right [are] sufficiently clear that

a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483

U.S. at 640.  Clearly established law should not be defined "at a high level of generality"; rather,

it "must be particularized to the facts of the case."  *White v. Pauly*, 137 S. Ct. 548, 552 (2017)

(per curiam) (citation omitted).  While this standard does not require "a case directly on point,"

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), courts typically should identify analogous cases, i.e., ones in which prison officials "acting under similar circumstances" violated the Eighth Amendment, *White*, 137 S. Ct. at 552. To be analogous, however, the case need not be "materially similar."[13]

In the Ninth Circuit, to assess whether a right is clearly established, courts first look to "Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010) (citation omitted). Absent binding precedent, courts should consider all relevant decisional law. *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985). Unpublished circuit and district court decisions inform the analysis. *Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004); *Krug v. Lutz*, 329 F.3d 692, 699 (9th Cir. 2003).[14]

Here, the "right of prisoners to adequate heat and shelter was known [in the 1980s] and that right is constant." *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991); *see also Graves*, 623 F.3d at 1049; *Thomas*, 611 F.3d at 1151; *Keenan*, 83 F.3d at 1091. Several cases are factually analogous.[15] It has also been established since no later than the 1990s that prison officials may display deliberate indifference if they know of longstanding, excessively cold temperatures and fail to address them. *Dixon*, 114 F.3d at 645; *see Farmer*, 511 U.S. at 842 (stating that, to establish a claim for deliberate indifference, an inmate may present evidence showing that a substantial risk of harm was "longstanding" and that the prison official was

---

[13] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (stating that, "in an obvious case," general legal standards may clearly establish law "without a body of relevant cases" (citing *Hope*, 536 U.S. at 738)); *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) (citation omitted) ("[E]ven if there is no closely analogous case law, a right can be clearly established on the basis of common sense.").

[14] The court considers only whether Mims is entitled to qualified immunity because it determined that no reasonable juror could find that Sisto violated the Eighth Amendment. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated . . . , there is no necessity for further inquiries concerning qualified immunity."), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

[15] *See, e.g.*, *Dixon*, 114 F.3d at 641–42, 644–45; *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987); *Gillespie*, 629 F.2d at 642; *Fields v. Junious*, No. 1:09–cv–01771–AWI–DLB PC, 2012 WL 2116351, at *7 (E.D. Cal. June 11, 2012), *report and recommendation adopted*, No. 1:09–cv–01771–AWI–DLB PC (E.D. Cal. Aug. 3, 2012).

"exposed to information concerning the risk and thus must have known about it").  Accordingly, Mims is not entitled to summary judgment based on qualified immunity.

**IV.     Conclusion**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.     Defendants' motion for summary judgment (ECF No. 80) be granted in part and denied in part, as follows:

a.     Summary judgment be granted to defendants on plaintiff's conditions-of-confinement claim against Sisto; and

b.     Summary judgment be denied to defendants on plaintiff's conditions-of-confinement claim against Mims.

2.     Defendants' motion to strike (ECF No. 93) be granted in part and denied in part.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  September 6, 2017.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

33

| Month/Year | Average Minimum Temperature | Average Maximum Temperature | Average Average Temperature |
|---|---|---|---|
| January 2006 | 41.3 | 58 | 49.7 |
| February 2006 | 39.5 | 63.6 | 51.6 |
| March 2006 | 41.3 | 57.9 | 49.6 |
| *** | *** | *** | *** |
| November 2006 | 44.2 | 64.3 | 54.2 |
| December 2006 | 37.5 | 57.6 | 47.6 |
| January 2007 | 31.9 | 59.1 | 45.5 |
| February 2007 | 41.7 | 60.9 | 51.3 |
| March 2007 | 44.9 | 73.3 | 59.1 |
| *** | *** | *** | *** |
| November 2007 | 43 | 70.1 | 56.5 |
| December 2007 | 37.5 | 56 | 46.7 |
| January 2008 | 39.4 | 52.9 | 46.1 |
| February 2008 | 40.3 | 61.1 | 50.7 |
| March 2008 | 43.7 | 68.4 | 56 |

[16] *See generally* National Centers for Environmental Information, Climate Data Online—Mapping Tool, https://gis.ncdc.noaa.gov/maps/ncei/summaries/monthly (last visited June 22, 2017).

[17] Because temperatures vary and cold temperatures are possible outside of the meteorological and astronomical winters, the court broadly defines winter from November 1 until the end of March of the following year. *Gomez v. McDonald*, No. 2:11–cv–0649 KJM DAD P, 2015 WL 5435256, at *40 (E.D. Cal. Sep. 15, 2015) (defining "wintertime" for purposes of Eighth Amendment claim alleging inadequate cell heat "from November 1 through April 1 of the following year"), *report and recommendation adopted*, No. 2:11–cv–0649 KJM DAD P (E.D. Cal. Dec. 10, 2015). However, not all of these months are represented for the winter of 05/06 because plaintiff is time-barred from relying on incidents before January 25, 2006. Likewise, only November of the winter of 11/12 is represented because plaintiff left SOL on November 22, 2011.

| | | | |
|---|---|---|---|
| *** | *** | *** | *** |
| November 2008 | 48 | 68.9 | 58.4 |
| December 2008 | 37.5 | 55 | 46.3 |
| January 2009 | 38.3 | 62.2 | 50.3 |
| February 2009 | 43.7 | 60.2 | 51.9 |
| March 2009 | 45.9 | 67.6 | 56.7 |
| *** | *** | *** | *** |
| November 2009 | 43.9 | 67.3 | 55.6 |
| December 2009 | 39.2 | 54.4 | 46.8 |
| January 2010 | 42.2 | 53.8 | 48 |
| February 2010 | 44.2 | 59.9 | 52.1 |
| March 2010 | 43.4 | 65.3 | 54.4 |
| *** | *** | *** | *** |
| November 2010 | 43 | 66.3 | 54.7 |
| December 2010 | 43.3 | 56.4 | 49.9 |
| January 2011 | 36.8 | 55.2 | 46 |
| February 2011 | 36.9 | 60 | 48.5 |
| March 2011 | 44.3 | 61.9 | 53.1 |
| *** | *** | *** | *** |
| November 2011 | 39.3 | 61.3 | 50.3 |